**F I L E D**

**UNITED STATES COURT OF APPEALS**

**October 13, 2005**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

EDWARD A. SHAW,

    Defendant - Appellee.

Nos. 01-3344 & 01-3310
(D. Kansas)
(D.Ct. No. 99-CR-10081-01-JMT)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

---

Edward Shaw was convicted by a jury of knowingly engaging in a scheme to falsify, conceal or cover up the presence of asbestos at the Shallow Water Refinery, in violation of 18 U.S.C. § 1001(a)(1).[1] He was sentenced to four

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] 18 U.S.C. § 1001(a)(1) provides:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

months imprisonment, which was stayed pending this appeal. On appeal, Shaw challenges his conviction and sentence on the following grounds: (1) the district court lacked subject matter jurisdiction over his prosecution under 18 U.S.C. § 1001 because 42 U.S.C. § 7413(c) is the exclusive means by which the Government may prosecute the making of a false statement on a form required by the Clean Air Act (CAA), (2) his prosecution under 18 U.S.C. § 1001 was barred by the five year statute of limitations, (3) the Government failed to show he had a legal duty to disclose the presence of asbestos at the refinery, and (4) the district court erred in holding Shaw accountable under USSG §2F1.1 for the cost of the clean up of the buried asbestos at the refinery. The Government cross-appeals, arguing the district court erred in denying a two level enhancement to Shaw's sentence for more than minimal planning under USSG §2F1.1(b)(2). After briefing was completed in this matter, the United States Supreme Court decided *Blakely v. Washington*, 542 U.S. 296 (2004). Shaw requested permission to file supplemental briefing addressing *Blakely*, which was granted. In his supplemental brief, Shaw argues *Blakely* applies to the federal sentencing guidelines and he was sentenced in violation of the Sixth Amendment. Exercising

_____

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact . . .

shall be fined under this title [and] imprisoned not more than 5 years . . . .

-2-

jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm Shaw's conviction but remand for resentencing.

Because of the complexity of this appeal, we divide our discussion in two-- first addressing Shaw's appeal of his conviction and then addressing all sentencing issues.

### I. Conviction

A. Factual Background

Shaw, a professional engineer, owns and operates ESCM & Associates Inc. (ESCM), an engineering and environmental consulting firm. In 1993, EZ Serve, one of ESCM's clients, contacted Shaw concerning the Shallow Water Refinery, an abandoned oil refinery located near Scott City, Kansas, which EZ Serve owned.[2] EZ Serve wished to demolish the refinery and requested Shaw's assistance. Shaw decided to obtain bids for the demolition. On July 15, 1993, as part of the bidding process, Shaw escorted several metal salvage companies through the refinery. One of those companies was Southwest Wrecking, a small company owned by Jean Stiffler and operated by Carl and Jean Stiffler and three of their children, Lee, Scott and Carla (the Stifflers). Also present at the walk-through were Steve Allred and Barry Yaffe, representatives of the Yaffe

---

[2] The Shallow Water Refinery was abandoned in the early 1980's. It consists of approximately eighty acres.

Companies, another potential bidder.

At trial, Allred and Yaffe testified that during the walk-through, they observed materials throughout the refinery which they believed contained asbestos. They raised these observations with Shaw. According to Yaffe and Allred, Shaw informed them the property was clean and the materials they observed contained calcium silicate (cellulose) not asbestos.[3] Lee Stiffler testified Shaw informed his family at the walk-through that the property did not contain asbestos, that the insulation throughout the refinery contained cellulose and that the only concern was the presence of hydrocarbons, which Shaw indicated he would help abate. Carl Stiffler testified he did not recall Shaw making any representations concerning asbestos during the walk-through; he stated Shaw informed the Stifflers the insulation material was cellulose.

A week after the walk-through, EZ Serve requested that ESCM purchase the Shallow Water Refinery. Immediately thereafter, the Stifflers contacted Shaw, informing him they wished to purchase the refinery for $50,000. Therefore, Shaw/ESCM decided to purchase the property from EZ Serve and

---

[3] Disagreeing with Shaw's representations concerning the presence of asbestos, Yaffe and Allred offered EZ Serve a negative bid of $225,000-$250,000 to demolish the refinery. They believed they could sell the scrap metal on the property for $500,000. However, they calculated it would require $225,000-$250,000 to demolish the refinery and $225,000-$250,000 to remove the asbestos and hydrocarbons. Thus, in order to realize a profit, Yaffe and Allred's bid required EZ Serve to pay for abatement.

-4-

immediately reconvey it to the Stifflers.  ESCM purchased the property from EZ Serve for $5,000.  On August 23, 1993, ESCM sold it to the Stifflers for $50,000. Pursuant to the terms of the sales agreement, the Stifflers agreed to pay $20,000 at closing[4] and remit the balance (without interest) on or before August 31, 1994.[5] The agreement also informed the Stifflers that (1) the property may contain asbestos, gasoline hydrocarbons, and other contaminants, (2) the property was being sold "'AS IS,'" and (3) the Stifflers assumed "all responsibility for complying with and/or bringing the [property] into compliance with any environmental law or regulation."  (R. Supp. Vol. I at 36.)  Jean Stiffler testified she had "complete[] trust" in Shaw and that neither she nor any of her family members read the sales agreement before signing it.[6]  (R. Vol. IV at 410.) Therefore, she stated she never knew the agreement indicated asbestos may be on the property and Shaw never told her or her family that asbestos may be present.

In addition to the sales agreement, Shaw wrote a letter addressed to Carla Stiffler outlining the terms of a separate agreement between ESCM and the Stifflers.  This letter, dated August 23, 1993, stated in relevant part:

---

[4] The Stifflers obtained the $20,000 down payment with a bank loan.  Shaw assisted them in securing the loan by writing a letter to the bank estimating the value of the scrap metal on the property at $725,000.

[5] The Stifflers have only paid Shaw $1,000 of the $30,000 balance.

[6] Jean Stiffler testified she only has an eighth grade education and usually needs someone to explain to her what she reads.

This letter also serves as an agreement by ESCM to conduct up to six site visits to the property during the next 24 months, as deemed necessary by [the Stifflers], to provide engineering consulting. These site visits will be for a maximum eight hour duration each and all travel will be paid for by ESCM. Phone consultation for engineering matters will be provided during the 24 months following closing in regards to engineering concerns with the demolition of the refinery; these consultations will be at no cost to [the Stifflers].

(R. Supp. Vol. I at 38.) In conclusion, the letter stated, "We look forward to working with you on this project." (*Id.*) Jean Stiffler testified she never saw this letter. She believed, based on conversations with Shaw, that he would be the Stifflers' consultant regarding the removal of insulation (which she believed, based on Shaw's representations, contained cellulose) and he would complete all necessary paperwork for them. Carl Stiffler testified Shaw told his family he would be their "environmental consultant." (R. Vol. IV at 562.)

After closing, the Stifflers began demolishing the refinery and salvaging the scrap metal for sale. On November 3, 1993, David Branscum from the Kansas Department of Health and Environment (KDHE) arrived at the refinery to inspect it. He was approached by Jean Stiffler who refused to allow him on the property, stating she would have to contact Shaw, "their environmental guy," to see if she could let him on the property. (*Id.* at 585.) Branscum left the refinery and returned to Scott City, where he learned no Notification of Demolition and

-6-

Renovation had been filed for the refinery.[7]

Branscum returned to the refinery the next day. This time, Branscum was met by Lee Stiffler. Branscum requested access to the refinery to photograph and take samples of suspected asbestos materials.[8] Lee informed Branscum they needed to contact Shaw before permitting him on the property.[9] Eventually, Shaw was contacted by telephone; Shaw informed Branscum he could enter the property escorted by Lee Stiffler. Accompanied by Lee, Branscum inspected the property and took pictures. After his inspection, Branscum informed Lee there were some compliance issues, including licensing requirements, which needed to be addressed, and it would be in the Stifflers' best interests to cease their demolition activities.

The next day (November 5), pursuant to the Stifflers' request, Shaw arrived

---

[7] Federal regulations require an owner or operator of a demolition or renovation activity involving the presence of asbestos to provide the Environmental Protection Agency with written notice of the intent to demolish or renovate and to update this notice if the amount of asbestos changes by at least twenty percent. 40 C.F.R. § 61.145(a), (b)(1),(2). This notice must be filed with the EPA at least ten days before asbestos stripping and removal begins or demolition work commences, depending on the specific circumstances of each project. 40 C.F.R. § 61.145 (b)(3)(I). This notice is referred to throughout this opinion as a "Notification of Demolition and Renovation."

[8] Branscum testified experience had taught him that refineries often had asbestos-containing insulating material.

[9] Both Lee and Jean Stiffler testified they denied Branscum access to the refinery because Shaw had told them not to let any government inspectors on the property without contacting him first.

at the refinery.  The Stifflers informed Shaw they needed an asbestos inspection performed and a Notification of Demolition and Renovation submitted to the Government.  They further informed him they could not continue their demolition of the refinery until the notification was submitted.  They asked Shaw to fill out and submit the notification for them.  Based on recent training he had received in the supervision of asbestos abatement,[10] Shaw agreed to inspect the property and complete and submit the notification.  He did not require the Stifflers to pay him for these services.  While Shaw completed the necessary paperwork, Shaw arranged for the Stifflers to work on a demolition project in Texas.[11]

On November 8, 1993, Shaw telephoned Alice Law, NESHAP[12] asbestos coordinator at the Environmental Protection Agency (EPA), seeking general information concerning the EPA's regulations.  He informed her of his qualifications and told her there was no asbestos in Area A of the Shallow Water

---

[10] Shaw obtained accreditation as a supervisor of asbestos abatement projects from the Georgia Institute of Technology on October 15, 1993.

[11] Lee Stiffler testified that the Texas project involved the removal of asbestos, which Shaw supervised.  He stated Shaw required the asbestos to be wetted prior to its removal, bagged and hauled to a landfill.  He also testified Shaw required the workers to be suited properly when handling asbestos.  Lee admitted he believed the regulation of asbestos was "overrated."  (R. Vol. III at 364.)

[12] NESHAP stands for National Emissions Standards for Hazardous Air Pollutants. These standards were established by the Environmental Protection Agency pursuant to the CAA and specifically regulate any activity which may result in the emission of asbestos into the atmosphere, including the disposal of asbestos.  See 42 U.S.C. § 7412 (b), (d)(1); 40 C.F.R. §§ 61.140 et seq.

Refinery, only bear metal tanks and piping.[13]  The next day, Law received a Notification of Demolition and Renovation concerning the Shallow Water Refinery.  The notification, dated November 8, 1993, indicated there was no asbestos in Area A of the refinery.  Specifically, it stated: "Area 'A' consist[s] of bare metal carbon steel tanks.  No insulation or other material to test.  Cut only bare metal carbon steel piping."  (R. Vol. I at 106.)  It also stated: "If unexpected asbestos or suspected asbestos material is encountered, all work will stop and area secured until properly abated."  (*Id.* at 107.)  The notification also indicated demolition of Area A would begin on November 18, 1993, and end on December 31, 1994.  The space designated "Signature of Owner/Operator" was signed by "Edward A. Shaw, Agent for S.W. Wrecking."  (*Id.*)

Accompanying the notification was a certificate of Shaw's accreditation as a supervisor of asbestos abatement projects, a map of the refinery and a cover letter.  The cover letter, written by Shaw and dated November 8, 1993, stated in relevant part:

> On November 3, 1993, [the Stifflers] were advised by . . . David Branscum[] that they had not filed the proper notification with your office in regards to the demolition.  They immediately halted the demolition effort and commissioned me to conduct the proper inspection and file the proper

---

[13] The refinery was divided into three areas -- A, B and C.  Area A was referred to as the "light product storage area" where the oil was once stored prior to processing.  (R. Vol. VI at 886.)  Area B was the hot storage area and Area C was the main process area, containing heaters and distillate columns.

notifications.

As we discussed, I have inspected the facility. . . . Area A consist[s] of only bare steel tanks and bare steel piping. There is no asbestos material in the area to be removed. There may be asbestos containing materials in areas B and C.

The attached notice is for demolition of Area A only. No work will be conducted in Areas B or C at this time. I will be conducting an extensive survey in Areas B and C, collecting samples of materials that may contain asbestos, and forwarding them to a laboratory for analysis. After receipt of the laboratory report, I will provide a completed asbestos survey report and will submit notification of demolition activities and asbestos removal abatement activities for Areas B and C.

As we discussed on the telephone, [Southwest] Wrecking is a small family owned business and [it has] a strong desire to comply with all applicable regulations. Our company will be working with [the Stifflers] very closely on the remainder of this project to assist them in their compliance efforts.

(R. Supp. Vol. I at 39.)

Thereafter, Shaw informed the Stifflers they could return to work at the Shallow Water Refinery. The Stifflers returned to the refinery based solely on Shaw's representation that they could do so as they never received written notification from the KDHE that they could resume their work at the refinery. Before their return to the refinery, Shaw never informed the Stifflers there was asbestos on the property or that they should only cut bare steel tanks and piping. He did, however, provide them with a map delineating Areas A, B and C. He also told them to contact him before moving from Area A to another area.

On December 9, 1993, Branscum returned to the refinery to verify the information in the November 8, 1993 "Notification of Demolition and

-10-

Renovation." He was allowed to enter the refinery, again escorted by Lee Stiffler. Branscum took several photographs and samples from Area A of the refinery. Later, he submitted these samples for testing. Test results revealed the presence of asbestos in Area A.[14] During this December 9, 1993 visit, Branscum did not see any evidence that the asbestos was being wetted prior to its removal.[15]

On March 3, 1994, Shaw visited the Shallow Water Refinery to take samples. At that time, the Stifflers were beginning to move their demolition activities from Area A to Area B. At Shaw's direction, Lee and Scott Stiffler obtained forty-eight samples from all three areas of the refinery. Lee testified that while he and Scott were assisting Shaw, they came across a hole they had dug to bury insulation.[16] According to Lee, Shaw told them they could continue to bury the insulation because it was not asbestos.[17] Carl Stiffler testified Shaw saw the holes filled with insulation and Jean Stiffler testified Shaw told them they could bury the insulation. Later, Shaw submitted the samples he had collected to a laboratory in Gainesville, Florida, for testing. Samples from Areas B and C

---

[14] Lee Stiffler testified that despite numerous calls to the KDHE, his family never received notice of the results of Branscum's sampling.

[15] One asbestos-removing procedure involves wetting the asbestos-containing material with a water solution, removing the asbestos, sealing it in plastic bags and disposing of it in an approved landfill.

[16] Lee testified insulation was buried in three different locations on the property. He stated over 100 pounds of insulation was dumped in each location.

[17] Lee also testified that on other visits to the refinery, Shaw observed other holes where insulation material had been dumped. Lee stated Shaw did not "really say a whole lot, just carry on." (R. Vol. III at 352.)

showed the presence of asbestos; none of the samples from Area A tested positive for asbestos.

Based on these results, Shaw completed and filed a revised Notification of Demolition and Renovation with the EPA. This notification, which was mailed on June 20, 1994, and received by the EPA on June 23, 1994, indicated there was asbestos on the property and that it would be removed using the "wet method." (R. Vol. I at 110); *see* n.15, *supra*. This notification contained the signature of "C.L. Stiffler"[18] and was dated April 22, 1994. (*Id.*)

Accompanying the revised notification was a letter from Shaw dated June 17, 1994, stating asbestos was discovered on the property. It further stated:

> We have arranged, [on] behalf of [the Stifflers], to have BFI Waste Management haul the removed [asbestos] and place [it] in [its] landfill in Fountain, Colorado. [The Stifflers have] indicated that they are receiving the necessary training from Kansas for Asbestos Removal Operations and that they will have our personnel on site as Supervisors.
>
> We will be collecting air samples on a regular basis and submitting them for laboratory analysis. We will also conduct field fiber screening while the asbestos removal project is in progress.

(*Id.* at 108.) At trial, the parties stipulated that Shaw "never requested a contract with BFI pertaining to the disposal of asbestos from the Shallow Water Refinery

---

[18] It is unclear who signed "C.L. Stiffler" to the notification. According to Jean Stiffler, who testified she was familiar with her husband's signature, it was not Carl's signature. Shaw also denied forging Carl's signature. According to Shaw, he left several blank copies of the notification with Carla Stiffler and she informed him she would ensure that one of them got signed. Apparently, the Stifflers returned two forms, one bearing the signature "C.L. Stiffler" and one bearing the signature "Lee Stiffler." Shaw completed and submitted both forms but filed the form containing the "C.L. Stiffler" signature with the EPA.

on behalf of himself or as an agent of Carl and Jean Stiffler, doing business as [Southwest] Wrecking, nor did he ever receive or view such a contract." (R. Vol. III at 257.) However, Shaw did contact BFI inquiring of the cost of removing the asbestos from the refinery and disposing of it at BFI's landfill. On May 20, 1994, BFI responded by letter to Shaw's inquiry, discussing the cost of its services.

On September 15, 1994, Russell Brichacek, Branscum's supervisor at the KDHE, visited the refinery. He met with Lee and Carla Stiffler and informed them that state law required them to have an asbestos contractor's license to perform demolition activities at a site involving asbestos. He then toured the facility with Lee. He observed several violations of the work practice standards for the removal of asbestos. In particular, he noticed insulation had been bagged and stored in the bath house without having been properly wetted prior to its removal. He was informed by Lee Stiffler that this insulation material came from Area A. He also observed insulation debris on the ground throughout the refinery. Brichacek took two samples from the bath house; later testing revealed the presence of asbestos.

On March 6, 1996, Kathryn Wright, a special agent in the Criminal Investigation Division of the EPA, was asked to investigate the violations taking place at the Shallow Water Refinery. Shaw was initially the target of her criminal investigation.[19] In June 1996, Wright went to the refinery but the gate was locked and she was unable to locate anyone on the property. Wright returned to the

_____

[19] Later, in April 1996, Southwest Wrecking and Carl and Jean Stiffler became targets of Wright's investigation.

-13-

property in August. Again, the gate was locked and she was unable to locate anyone to allow her access to the property. Therefore, Wright conducted a fly-over of the property, observing that demolition activity was being performed at the refinery. Meanwhile, Wright attempted to contact Shaw. In October 1996, Shaw telephoned Wright and agreed to be interviewed. Wright testified that during their conversation, Shaw told her he had instructed the Stifflers not to allow inspectors on the facility because it "was a refinery and anybody looking for any violation could find it." (R. Vol. V at 701.)

On November 14, 1996, Wright and her colleague William Absher interviewed Shaw. During the interview, Wright and Absher informed Shaw they wished to inspect the refinery. Shaw told them he would make arrangements for the inspection. Shaw eventually informed Wright that the EPA could inspect the refinery on December 16, 1996.

On that day, Wright and several other individuals from the EPA arrived at the refinery with a consent to search form.[20] Wright initially attempted to hand it to Shaw but Shaw told her she must give it to Carl Stiffler because he owned the property. Carl Stiffler signed the form and Wright and the other individuals were allowed to enter and inspect the property. As a result of this inspection, the EPA issued an emergency cease and desist order to the Stifflers, requiring them to

---

[20] Jean Stiffler testified that before these individuals arrived at the refinery, Shaw told her and her family that they needed to "stick together," which she interpreted to mean that they not allow themselves to be separated until they all had the same story to tell. (R. Vol. IV at 423.)

-14-

cease all demolition activity at the refinery.[21]

In May 1997, Brichacek returned to the property. He was met by Carl and Jean Stiffler who accompanied him as he inspected the property. He observed demolition activity had occurred since his last visit in September 1994; in particular, he noticed the catalytic cracker unit (cat cracker),[22] which had been standing during his last visit, was now laying on its side. He also noticed that much of the insulation from the cat cracker had been knocked loose and was scattered on the ground around it. According to Branscum, Carl Stiffler informed him that the cat cracker had been dropped[23] a week earlier and that Shaw had told Carl there was no asbestos on the cat cracker.[24] Brichacek took samples from the insulation material on the cat cracker; later testing revealed the presence of asbestos. Shortly after his visit, the KDHE issued an order citing the Stifflers with various state law violations.

On July 9, 1997, in response to the KDHE order, Jean Stiffler wrote the

_____

[21] During the EPA's visit, the Stifflers were interviewed. The Stifflers stated they had earned $150,000 from the sale of scrap metal from the refinery and estimated another $35,000 worth of scrap metal remained on the property.

[22] A catalytic cracker/cat cracker is "[a]n oil refinery unit in which the cracking of petroleum takes place in the presence of a catalyst." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000). The "cracking" of petroleum is the thermal decomposition of petroleum molecules into shorter molecules to extract low-boiling fractions such as gasoline. *Id.*

[23] When removing asbestos from a height, the proper procedure is to lower it, not drop it, in order to minimize the potential for airborne release of asbestos.

[24] Jean Stiffler testified they contacted Shaw for permission prior to dropping the cat cracker.

-15-

KDHE a letter requesting a hearing. In this letter, she stated, "[t]he samples we had from the catcracker were negative." (R. Vol. IV at 427 (quotations omitted).) Jean testified she made this statement based on a package she received from Washington, D.C., which stated the samples from the cat cracker were negative. She testified Shaw took those samples.

After the EPA issued the cease and desist order in December 1996, Wright visited the refinery in June 1997 to verify whether the order was being complied with by the Stifflers. Because no one was there to allow her access, Wright again conducted a fly-over. She observed that the Stifflers' heavy equipment was gone. Wright also visited the refinery in July, August and October 1997. Again, no activity was occurring.

On August 1, 1997, an informal meeting was held between several KDHE representatives and Carl and Jean Stiffler concerning the violations occurring at the refinery and what the Stifflers could do to come into compliance with state law. Shaw was present and did most of the talking on behalf of the Stifflers. On October 31, 1997, the Stifflers received their asbestos control license. In 1998, the Stifflers hired Dennis Shelton, an accredited asbestos project designer, to prepare an asbestos abatement plan for the refinery, which was filed with the KDHE. In June 1998, Brichacek visited the property for the third time. Although abatement activities had occurred, Brichacek observed that many of the same illegal conditions were still present.

B. Procedural Background

On June 15, 1999, Shaw and Carl and Jean Stiffler were charged by

indictment with (1) conspiracy to violate the NESHAP pertaining to asbestos in violation of 18 U.S.C. § 371 (Count I) and (2) violation of the NESHAP pertaining to asbestos in violation of 42 U.S.C. § 7413 and 18 U.S.C. § 2 (Count II).  Shaw was additionally charged with engaging in a scheme to falsify, conceal or cover up the presence of asbestos in violation of 18 U.S.C. § 1001(a)(1) (Count III) and making a false statement in violation of 18 U.S.C. § 1001(a)(2) (Count IV).  On November 17, 1999, a superseding indictment was issued against Shaw and Carl and Jean Stiffler.  The superseding indictment charged Shaw with (1) violating the NESHAP pertaining to asbestos in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2 (Count I); (2) engaging in a scheme to falsify, conceal, or cover up the presence of asbestos in violation of 18 U.S.C. § 1001(a)(1) (Count II); (3) making a false statement in violation of 18 U.S.C. § 1001(a)(2) (Count III); and (4) illegally disposing of asbestos in violation of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9603, and 18 U.S.C. § 2 (Count IV).  The superseding indictment charged Carl and Jean Stiffler with removing asbestos without accreditation in violation of 15 U.S.C. § 2646(a)(3) (Count V).

On March 24, 2000, the Government filed a superseding information against Carl and Jean Stiffler, charging them with failure to notify the EPA about the storage and disposal of asbestos at the Shallow Water Refinery, a misdemeanor.  The Stifflers entered into a plea agreement with the Government whereby they agreed to plead guilty to the superseding information.  In exchange for their guilty pleas and their cooperation in the Government's prosecution of

-17-

Shaw, including providing truthful testimony at his trial, the Government agreed to recommend a two point downward adjustment to their sentences for acceptance of responsibility and to file a motion for downward departure. It was not until they received this bargain that the Stifflers admitted they had buried asbestos on the property. On March 27, 2000, Carl and Jean Stiffler pled guilty; they were eventually sentenced to one year unsupervised probation.

On March 28, 2000, Shaw proceeded to trial. At trail, he testified that during the walk-through on July 15, 1993, he informed the Stifflers there was a possibility the property contained asbestos. He denied ever representing that the refinery was a clean plant. With regards to the separate agreement between ESCM and the Stifflers (outlined in Shaw's August 23, 1993 letter to Carla Stiffler), Shaw testified the agreement pertained to ESCM assisting the Stifflers in the designing of riggings and the testing of any liquids discovered in the tanks on the refinery. He stated he never agreed to be their environmental consultant and indeed, at the time of the August 1993 agreement, he did not have any training in asbestos abatement. He further testified he told Lee Stiffler to escort Branscum through the refinery to allow Branscum to relate any concerns directly to Lee and for Branscum's safety. Shaw also testified that on March 3, 1994, he did not attempt to collect clean samples from Area A and took samples from materials containing insulation. Shaw conceded he could have made mistakes in sampling Area A but stated he never deliberately misled anyone concerning what he believed was on the property. Lastly, Shaw testified he never instructed any of the Stifflers to bury insulation.

-18-

On April 12, 2000, the jury returned its verdict, finding Shaw guilty on Count II but not guilty on Counts I and IV.  No verdict was returned on Count III because it was charged and presented to the jury in the alternative to Count II. During trial and after the jury's verdict, Shaw moved for a judgment of acquittal, arguing (1) insufficient evidence demonstrating a scheme to conceal, (2) the statute of limitations barred the prosecution of Count II, and (3) he had no duty to report the presence of asbestos.  The court rejected these arguments and denied his motion.  Shaw also filed a motion to set aside the verdict, arguing the district court lacked subject matter jurisdiction over his prosecution under 18 U.S.C. § 1001.  The court also denied this motion.

C. Discussion

Shaw attacks his conviction on three grounds: (1) the district court lacked subject matter jurisdiction over his prosecution under 18 U.S.C. § 1001 because 42 U.S.C. § 7413(c) is the exclusive means by which the Government may prosecute the making of a false statement on a form required to be filed under the CAA, (2) his prosecution under 18 U.S.C. § 1001 was barred by the five year statute of limitations, and (3) the Government failed to present sufficient evidence demonstrating he had a legal duty to disclose the presence of asbestos at the refinery.

Shaw raised the latter two arguments to the district court in a motion for judgment of acquittal.  "[We] review[] a denial of a motion for judgment of acquittal *de novo*, viewing the evidence in the light most favorable to the government in determining if there is substantial evidence from which a jury

-19-

could find the defendant guilty beyond a reasonable doubt." *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000). We review jurisdictional issues and a district court's interpretation of the statute of limitations *de novo*. *United States v. Anderson*, 319 F.3d 1218, 1219 (10th Cir. 2003) (statute of limitations); *United States v. Cuch*, 79 F.3d 987, 990 (10th Cir. 1996) (jurisdiction).

1. Subject Matter Jurisdiction

The CAA, 42 U.S.C. § 7401 *et seq.*, contains a provision entitled "Federal Enforcement." *See* 42 U.S.C. § 7413. Within that provision is a subsection entitled "Criminal penalties" which states in relevant part:

(2) Any person who knowingly--

> (A) makes any false material statement, representation, or certification in, or omits material information from, or knowingly alters, conceals, or fails to file or maintain any notice, application, record, report, plan, or other document required pursuant to this chapter to be either filed or maintained (whether with respect to the requirements imposed by the Administrator or by a State);
>
> . . .
>
> shall, upon conviction, be punished by a fine pursuant to Title 18, or by imprisonment for not more than 2 years, or both . . . .

 42 U.S.C. § 7413(c)(2)(A).

Shaw contends 42 U.S.C. § 7413(c)(2)(A) is the sole and exclusive means by which the Government may prosecute the making a false statement to the EPA in violation of the CAA. Thus, he argues the district court lacked subject matter jurisdiction over his prosecution under 18 U.S.C. § 1001. Shaw also maintains that because 42 U.S.C. § 7413(c)(2)(A) and 18 U.S.C. § 1001 proscribe the same conduct, § 7413(c)(2)(A), the specific statute, trumps § 1001, the general statute,

-20-

unless Congressional intent demonstrates the general statute is to control. He asserts the language of § 7413(c)(2)(A) and the legislative history of the two statutes indicate Congress intended § 7413(c)(2)(A) to trump § 1001. Lastly, to the extent there is any ambiguity as to which statute controls, Shaw contends the rule of lenity requires application of § 7413(c)(2)(A) because its penalty provision maximizes punishment at two years as opposed to five years under § 1001.

The Government maintains § 1001(a)(1) and § 7413(c)(2)(A) are two separate statutes which criminalize different behavior—the former criminalizes a scheme to conceal a material fact from the Government and the latter prohibits the making of a false statement within a document required to be filed by the EPA. It argues it was not required to choose one statute over the other and Shaw's conduct (knowingly and willfully submitting false and fraudulent representations to the EPA over a lengthy period of time) was prohibited by § 1001(a)(1). The Government further contends that because § 1001(a)(1) is not ambiguous, the rule of lenity is inapplicable.

Shaw's jurisdictional argument is without merit. It is well settled that "when an act violates more than one criminal statute, the Government may prosecute[] under either so long as it does not discriminate against any class of defendants." *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."). This is true even when one statute provides a harsher penalty. In *Batchelder*, the Supreme Court was confronted with two statutes, 18 U.S.C. § 922(h) and 18 U.S.C. § 1202(a), which proscribed

the same conduct but which carried different statutory maximums—five years and two years, respectively. *Id.* at 116-17. The Government decided to prosecute the defendant under § 922(h) and its attendant penalty provision, 18 U.S.C. § 924(a); the defendant was sentenced to the five year statutory maximum term of imprisonment. *Id.* On appeal, the Seventh Circuit concluded the defendant's sentence was limited to the two year statutory maximum applicable to violations of § 1202(a). *Id.* The Supreme Court reversed. *Id.* at 118. It concluded nothing in the legislative history of § 1202(a) (which was enacted after § 922(h) and § 924(a)) revealed Congress intended its penalty provision to override § 924(a). *Id.* at 119-21. It also rejected the application of the rule of lenity, stating § 924(a) unequivocally applies to convictions under § 922(h). *Id.* at 121-22. Lastly, the Court found no constitutional infirmity with the Government's choice to prosecute the defendant under the statute carrying the harsher punishment. *Id.* at 124-25.

We addressed a similar issue in *United States v. Wiles*, 102 F.3d 1043 (10th Cir. 1996). There, the defendant was charged with making a false statement to the Security and Exchange Commission (SEC) under 18 U.S.C. § 1001. *Id.* at 1066. On appeal, he alleged that Congress intended the Government to prosecute the making of a false statement to the SEC under 15 U.S.C. § 78ff, a specific provision in the Securities Exchange Act of 1934 which criminalizes the willful making of a false or misleading statement to the SEC. *Id.* Thus, the defendant argued that the making of a false statement to the SEC could not support a conviction under § 1001. *Id.* We rejected this argument, holding: "Without any

-22-

express indication that Congress intended otherwise, we . . . conclude that both § 78ff and § 1001 proscribe the making of false statements to the SEC, and the government may prosecute such conduct under either statute." *Id.* at 1067. *See also United States v. Radetsky*, 535 F.2d 556, 567-68 (10th Cir. 1976) (rejecting argument that the defendant should have been prosecuted under specific statute criminalizing the making of false statements in connection with medicare claims rather than § 1001 because there was no evidence of an intent to make the specific statute a substitute for any part of § 1001).

The same reasoning applies here. Despite Shaw's attempt to persuade us otherwise, we fail to discern from either the language of the CAA or its legislative history any Congressional intent to foreclose prosecutions under § 1001 where § 7413(c)(2)(A) may also apply. Without such intent, we defer to the Government's prosecutorial discretion.[25] Moreover, the Government alleged Shaw engaged in a scheme to conceal the presence of asbestos. Section 7413(c)(2)(A) of the CAA does not proscribe such conduct. Consequently, charging Shaw under § 1001(a)(1), which does prohibit such conduct (*see* n.1, *supra*), was proper.

### 2. Statute of Limitations

A five year statute of limitations applies to prosecutions under 18 U.S.C. § 1001. *See* 18 U.S.C. § 3282 (providing a five year statute of limitations for

---

[25] Because we find no ambiguity in either statute, the rule of lenity does not apply. *Callanan v. United States*, 364 U.S. 587, 596 (1961) (holding that the rule of lenity, "as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one").

noncapital offenses). Shaw contends the statute of limitations began to run in November 1993, when he submitted the original Notification of Demolition and Renovation denying the presence of asbestos in Area A of the Shallow Water Refinery. Because the original indictment was not filed until June 15, 1999, he argues his prosecution under 18 U.S.C. § 1001 was time-barred. He further maintains that the Government cannot rely on the June 17, 1994 Notification of Demolition and Renovation and accompanying letter because neither of these documents contained false information. He alleges that at the time he made the representations within those documents, he had been negotiating with the Stifflers to supervise the asbestos abatement project and had made the preliminary arrangements for BFI to remove and dispose of the asbestos at the refinery. He also states the evidence at trial did not show he signed Carl Stiffler's name to the notification. Indeed, he states his undisputed testimony demonstrated he provided the Stifflers with a blank notification form and they submitted it to him with Carl Stiffler's signature. Moreover, he argues the Government cannot rely on the letter Jean Stiffler wrote to the KDHE in 1997 because she never testified that Shaw told her the cat cracker did not contain asbestos. More importantly, he contends there is nothing in the record demonstrating that Jean's conduct in 1997 should be imputed to him. Lastly, Shaw maintains that the superseding indictment charged him with concealing the presence of asbestos. Because the alleged false statements occurring in 1994 or 1997 concerned the removal of asbestos, not its presence, Shaw asserts the Government cannot rely on these statements as conduct occurring within the five years preceding the original indictment.

-24-

The Government argues Shaw's prosecution under § 1001 was not time-barred. It asserts Shaw's ongoing scheme to defraud continued until at least June 20, 1994, but also into 1997. It points to the June 17, 1994 correspondence to the EPA (which Shaw mailed on June 20, 1994) and the enclosed Notification of Demolition and Renovation which contained the forged signature of "C.L. Stiffler." It contends these documents falsely stated that the Stifflers would have ESCM personnel on site as supervisors and that arrangements had been made with BFI to remove and dispose of any asbestos. The Government also points to Shaw's representation to Jean Stiffler in 1997 that the cat cracker had been tested for asbestos and no asbestos had been found. Relying on this representation, Jean wrote the KDHE stating the Stifflers had been informed the cat cracker did not contain asbestos and it could be demolished.

We reject Shaw's statute of limitations argument. In criminal cases, the statute of limitations normally begins to run when the crime is complete. *United States v. Reitmeyer*, 356 F.3d 1313, 1317 (10th Cir. 2004). "A crime is complete [when] every element in the crime occurs." *Id.* (quotations omitted). Here, the superseding indictment charged Shaw with a *scheme* to conceal the presence of asbestos from 1993 to 1997.[26] Therefore, the crime was not completed and the

---

[26] Count II of the superseding indictment stated the following in relevant part:

Commencing in November of 1993 . . . and continuing through September of 1997 . . .

EDWARD A. SHAW

within the District of Kansas, did knowingly and willfully, in a matter within the jurisdiction of the [EPA], [] falsify, conceal or cover[] up, by a scheme, material facts, to wit the presence of asbestos at various locations within the Shallow Water

-25-

statute of limitations did not begin to run until this scheme was completed in 1997. *United States v. Jensen*, 608 F.2d 1349, 1355 (10th Cir. 1979) ("[T]he statute of limitations is no bar if there is an ongoing scheme continuing into the [statute of limitations] period.").[27] Because the scheme continued into the five years preceding the filing of the original indictment (June 15, 1999), the indictment was timely. We also reject Shaw's argument that his conduct in 1994 and 1997 cannot be included in the scheme to conceal the presence of asbestos

---

Refinery site . . . .

(R. Vol. I at 40.) Thereafter, Count II alleged Shaw's scheme to falsify, conceal and cover up the presence of asbestos at the Shallow Water Refinery included but was not limited to the following acts: (1) Shaw advising the Stifflers to deny Branscum access to the facility, (2) Shaw's November 8, 1993 letter informing the EPA he had inspected the refinery, that Area A only consisted of bare steel tanks and piping and Area A did not contain asbestos, (3) Shaw's submission of the November 8, 1993 Notification of Demolition and Renovation indicating there was no asbestos-containing material in Area A of the refinery, (4) Shaw's June 17, 1994 letter informing the EPA that ESCM had arranged for BFI to haul and dispose of the asbestos from the refinery, (5) Shaw's filing of the revised Notification of Demolition and Renovation bearing the purported signature of "C.L. Stiffler" and containing false and misleading representations, (6) Shaw's statement at the August 1, 1997 meeting between the KDHE and the Stifflers indicating the Stifflers had contacted several environmental firms to address the problems at the Shallow Water Refinery, and (7) Shaw's August 15, 1997 letter to the EPA and KDHE advising of the steps the Stifflers were taking to comply with the environmental laws and regulations.

[27] This is not to be confused with the continuing offense doctrine. In *United States v. Dunne*, 324 F.3d 1158, 1166 (10th Cir. 2003), we held § 1001 is not a continuing offense crime for statute of limitations purposes. However, the fact that § 1001 is not a continuing offense crime is not dispositive of the statute of limitations issue because the Government charged Shaw under § 1001's *scheme* provision. *Id.* at 1164 (stating a continuing offense "is not the same as a scheme or pattern of illegal conduct") (quotations omitted).

because it involved the removal/disposal of asbestos, not its presence. Shaw reads the term "presence of asbestos" in the superseding indictment too narrowly. It is clear the Government did not seek to limit his scheme only to the concealment of the physical presence of asbestos but also the concealment of its improper removal and disposal. Indeed, in the superseding indictment, the Government alleged Shaw's scheme to conceal included his preparation and submission of the June 1994 Notification of Demolition and Renovation and accompanying cover letter to the EPA. The documents indicated the asbestos discovered at the refinery would be wetted, bagged and removed by BFI to its landfill in Fountain, Colorado, and ESCM would be supervising the Stifflers' removal of the asbestos. None of this information was true.[28] Indeed, Shaw knew the Stifflers were burying insulation.

Even limiting Shaw's scheme to the concealment of the physical presence of asbestos, we conclude Shaw's activities in 1994 and 1997 involved such concealment. In November 1993, Shaw informed the EPA via the Notification of Demolition and Renovation that Area A of the refinery did not contain asbestos, when in fact it was riddled with asbestos. Continuing that concealment, none of Shaw's sampling from Area A in March 1994 tested positive for asbestos. Additionally, Shaw was aware the Stifflers were burying insulation and told Lee

---

[28] Shaw attempts to minimize the falsity of this information. He states that at the time he made the representations in the 1994 notification and cover letter, ESCM was in the process of negotiating with the Stifflers to provide them its services and BFI had been contacted regarding the removal of asbestos. However, the documents state these representations as established facts — that ESCM had arranged for BFI to remove the asbestos and that its personnel would be on site as supervisors.

Stiffler they could continue to do so. Shaw also gave the Stifflers permission to drop the cat cracker in May 1997, which was subsequently discovered to contain asbestos. Thereafter, the EPA ordered the Stifflers' demolition activities to cease and the KDHE cited them for various state law violations. As a result, Jean Stiffler wrote to the KDHE in July 1997 informing them no asbestos was present on the cat cracker. At trial, Jean testified she based this statement on samples Shaw took from the refinery. Therefore, contrary to Shaw's arguments, his activities in 1994 and 1997 concerned the concealment of the presence of asbestos.

Based on the above, we conclude the statute of limitations did not bar Shaw's prosecution under 18 U.S.C. § 1001(a)(1).

### 3. Duty to Disclose

Shaw argues that in order to convict him under § 1001, the Government had to prove he had a duty to disclose the presence of asbestos to the EPA. He states that under the EPA's regulations, only owners or operators are required to complete and file a Notification of Demolition and Renovation and therefore only owners or operators have a duty to disclose. Shaw contends it is undisputed that he did not own the refinery. As to whether he was an "operator" of the facility, he alleges the EPA's definition of operator as one who "operates, controls, or supervises a stationary source" should be declared void for vagueness. *See* 42 U.S.C. § 7412(a)(9). Alternatively, Shaw contends that to be an "operator," one must be more than a mere consultant and, at a minimum, must actively participate in the day-to-day activities of the demolition/renovation operation. He asserts the

-28-

Government's evidence at trial did not support such a finding.  Specifically, he points out he was not involved in the day-to-day operations at the refinery and made only a few visits to the refinery over a four year period.

The Government alleges that although Shaw may not have had a duty to report the presence of asbestos to the EPA, once he did so, he was obligated to provide truthful information under § 1001.  The Government also argues there is no requirement under § 1001 that there be a separate statute or regulation requiring the defendant to provide information.

Section 1001 of Title 18 encompasses two distinct offenses -- concealment of a material fact (18 U.S.C. § 1001(a)(1)) and the making of a false statement (18 U.S.C. § 1001(a)(2)).[29]  Shaw was convicted of the former.  A conviction under § 1001(a)(1), unlike that under § 1001(a)(2), requires proof that the defendant had a legal duty to disclose the fact concealed.[30]  The Government must

---

[29] 18 U.S.C. § 1001(a)(2) states in relevant part:

[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully –- . . .

    (2) makes any materially false, fictitious, or fraudulent statement or representation; . . .

shall be fined [or] imprisoned not more than 5 years . . . .

[30] *Compare United States v. Kingston*, 971 F.2d 481, 489 (10th Cir. 1992) (holding that under § 1001(a)(1), the Government must prove:  "1) the defendant knowingly concealed a fact by any trick, scheme, or device; 2) the defendant acted willfully; 3) the fact concealed was material; 4) the subject matter involved was within the jurisdiction of a department or agency of the United States; and 5) the defendant had a legal duty to disclose the fact concealed"), *with United States v. Irwin*, 654 F.2d 671, 675-76 (10th Cir.

establish that "the law required disclosure of the information at the time the defendant allegedly concealed it . . . ." *Irwin*, 654 F.2d at 679 ("[T]here can be no criminal conviction for failure to disclose when no duty to disclose is demonstrated."). Thus, to the extent the Government is arguing that it was not required to prove that Shaw had a legal duty to disclose the presence of asbestos to the EPA, it is mistaken. Indeed, the jury instructions required such a showing.

Nevertheless, the Government met its burden in this case. The "duty to disclose" element of § 1001(a)(1) can be established by demonstrating that an agency form required such disclosure. *Kingston*, 971 F.2d at 489 ("A defendant's duty to disclose is established where a government form required a disclosure of concealed information."). In this case, the Government presented the jury with the November 1993 and June 1994 "Notifications of Demolition and Renovation." These forms required disclosure of whether the demolition or renovation project involved the removal of asbestos, the approximate amount of asbestos, the description of the work practices to be used to prevent the emission of asbestos, and the identity of the waste transporter and waste disposal site. Thus, these forms created a legal duty on the one completing and submitting them to disclose the presence of asbestos and if present, the method of abatement. It is undisputed that Shaw completed and submitted these forms to the EPA. Consequently, he had a legal duty to disclose the presence of asbestos. This is true even if Shaw, as

1981) (holding that § 1001(a)(2) requires the Government to show: "(1) the defendant made a statement; (2) the statement was false, fictitious or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material").

a non-owner/operator of the refinery, was not required to complete or submit these forms to the EPA under the federal regulations. *See* 40 C.F.R. § 61-145(b) (requiring owners/operators to provide written notice of demolition activity involving asbestos to the EPA). The notification form itself, apart from the federal regulations, created a duty to disclose. Additionally, nothing in the regulations preclude an owner/operator from having an agent complete and submit the notification on his/her behalf.

D. Conclusion

Based on the above, we affirm Shaw's conviction. We now turn to the parties' sentencing arguments.

## II. Sentence

In Shaw's presentence investigation report (PSR), the probation officer calculated the base offense level as 6 pursuant to USSG §2F1.1, the guideline applicable for a violation of 18 U.S.C. § 1001(a)(1).[31] The officer enhanced the base offense level by five based on the EPA's estimate that it would cost $50,000 to clean up the asbestos improperly buried at the Shallow Water Refinery. *See* USSG §2F1.1(b)(1)(F) (providing for a five level increase in the base offense level if the "loss" was more than $40,000 but less than $70,000). The officer also enhanced the base offense level by two levels because the offense involved repeated acts and therefore more than minimal planning. *See* USSG §2F1.1(b)(2).

---

[31] Because Shaw was sentenced pursuant to the 1995 edition of the United States Sentencing Guidelines Manual, all guideline citations refer to the 1995 edition, unless noted otherwise.

The probation officer further recommended a two level upward adjustment because the offense was committed by someone with special skill. *See* USSG §3B1.3. Based on a total offense level of 15 and a criminal history category of I, the probation officer determined the sentencing guideline range was eighteen to twenty-four months imprisonment.

Shaw filed numerous objections to the PSR. In particular, he opposed the five level enhancement based on the "loss" exceeding $40,000, the two level enhancement for more than minimal planning and the two level upward adjustment because the offense was committed by someone with special skill. Shaw also filed a motion for downward departure based on aberrant behavior. Shaw initially appeared for sentencing on June 29, 2001, but the sentencing hearing was continued to September 5, 2001, to allow the parties to brief the subject matter jurisdiction issue. Ultimately, the district court imposed the five level enhancement based on the "loss" exceeding $40,000,[32] denied the two level enhancement for more than minimal planning, denied the two level upward adjustment based on the offense being committed by someone with special skill and denied the motion for downward departure based on aberrant behavior. Based on these determinations, the district court calculated an offense level of 11.

---

[32] At sentencing, the Government presented the testimony of Kenneth Rapplean, the on-scene coordinator in the Super Fund Division of the EPA. He testified approximately 510 cubic yards of asbestos was buried at the refinery and estimated it would cost the EPA a total of $247,479 to clean it up. Based on this testimony, the district court found that the total cost to clean up the refinery was close to a quarter of a million dollars and therefore, the cost of remediation will "clearly" exceed $50,000. (R. Vol. VIII at 1075.) Consequently, the court concluded a five level enhancement to the base offense level was appropriate under USSG §2F1.1(b)(1)(F).

With a Criminal History Category I, the court determined the applicable guideline range was eight to fourteen months imprisonment. The court sentenced Shaw to four months imprisonment and two years of supervised release, recommending that Shaw serve his four month sentence in a halfway house. As a special condition of supervised release, the court ordered Shaw to serve four months of home confinement. *See* 18 U.S.C. §§ 3563(b)(19), 3583(d); *see also* USSG §5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."). The court further ordered Shaw to pay $50,000 in restitution to the EPA.

On appeal, Shaw challenges the five level enhancement based on the "loss" exceeding $40,000 under USSG §2F1.1(b)(1)(F) and argues he was sentenced in violation of the Sixth Amendment under *Blakely v. Washington*, 542 U.S. 296 (2004). The Government cross-appeals, arguing the district court erred in denying the two level enhancement for more than minimal planning under USSG §2F1.1(b)(2). As we discuss next, because we conclude the district court erred in failing to impose a two level enhancement for more than minimal planning, we need not reach the other issues.

A. Standard of Review

The Supreme Court recently decided *United States v. Booker*, 125 S. Ct. 738 (2005). In *Booker*, the Supreme Court invalidated the mandatory-nature of the federal sentencing guidelines. *Id.* at 756-57. It also altered our standard of review, requiring us to review sentences for unreasonableness. *Id.* at 765-66. However, because Shaw was sentenced prior to *Booker*, we apply the pre-*Booker*

standard of appellate review, reviewing legal questions *de novo* and any factual findings for clear error. *United States v. Souser*, 405 F.3d 1162, 1165 (10th Cir. 2005); *United States v. Doe*, 398 F.3d 1254, 1257 (10th Cir. 2005).

B. Denial of Two Level Enhancement for More than Minimal Planning

Section 2F1.1(b)(2) of the guidelines requires a two level enhancement to the base offense level if "the offense involved [] more than minimal planning . . . ." The Commentary to §2F1.1 refers to the Commentary to §1B1.1 for the definition of "more than minimal planning." USSG §2F1.1 comment. (n. 2). The Commentary to §1B1.1 states:

> "More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense. . . . "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

USSG §1B1.1 comment. (n. 1(f)). "[T]he . . . more than minimal planning enhancement[] [is] designed to target criminals who engage in complicated criminal activity because their actions are considered more blameworthy and deserving of greater punishment than a perpetrator of a simple version of the crime." *United States v. Rice*, 52 F.3d 843, 851 (10th Cir. 1995).

In its cross-appeal, the Government challenges the district court's denial of a two level enhancement under USSG §2F1.1(b)(2) for more than minimal planning. It contends this enhancement was appropriate because Shaw engaged in repeated acts over a period of time, including: (1) making fraudulent written and

oral representations to the EPA in a telephone call, letter and Notification of Demolition and Renovation in November 1993; (2) conducting a fraudulent sampling of the refinery on March 3, 1994; (3) making fraudulent representations to the EPA in a letter and revised Notification of Demolition and Renovation in June 1994; (4) obtaining a false signature on the revised "Notification of Demolition and Renovation;" and (5) representing to the Stifflers that the cat cracker did not contain asbestos. The Government also alleges Shaw's actions involved "more planning than is typical for commission of the offense in a simple form." It points out that in November 1993, rather than simply informing the EPA that there was no asbestos in Area A, Shaw "took pains" in his correspondence to (1) include his certification as a licensed supervisor of asbestos abatement projects, (2) advise that he had personally inspected the premises, and (3) inform the EPA that demolition activities would stop if any asbestos was found. (Government's Br. at 29.) The Government also refers to the fact that Shaw then conducted a sampling of the refinery in such a way as to confirm that no asbestos was present in Area A. It also points to Shaw's false assurances to the EPA in 1994 that the Stifflers were complying with the environmental regulations and ESCM was supervising their activities. Lastly, the Government points out Shaw informed the Stifflers it was permissible to bury insulation from Area A, thereby preventing the EPA from discovering it.

Shaw contends the district court properly denied the more than minimal planning enhancement. He contends the March 1994 sampling, the burial of asbestos and the June 1994 correspondence were "purely opportune" and not in

furtherance of the offense. He also contends that although his sampling in Area A did not reveal the presence of asbestos, many of his other samples tested positive for asbestos. Based on his sampling, he prepared a revised "Notification of Demolition and Renovation," stating "all areas" of the facility contained asbestos. (R. Vol. I at 109.) Therefore, he contends he was not trying to deceive the EPA about the presence of asbestos.

A district court's decision that the defendant engaged in more than minimal planning is reviewed for clear error. *United States v. Orr*, 68 F.3d 1247, 1253 (10th Cir. 1995); *United States v. Williams*, 966 F.2d 555, 558 (10th Cir. 1992). "Clear error occurs . . . when we are left with the firm conviction a mistake has been made." *United States v. Lin*, 410 F.3d 1187, 1192 (10th Cir. 2005).

At the initial sentencing hearing, the district court denied Shaw's objection to the more than minimal planning enhancement, stating:

> In this case it appears to me - and it is accurate - this occurred over a period of four years, four and a half years, started in '93 and went into '97. . . . I am aware, of course, . . . that Mr. Shaw was acquitted on a couple of counts as well, but the standard that we use here in terms of whether minimal planning occurred or not is not whether it's been proved beyond a reasonable doubt or not, but it's a much lighter standard here. It is my sense, given the number of contacts that Mr. Shaw had with the Stifflers, with the state and the other persons who have been involved in this case that -- let me back up. I think a good case could be made that there wasn't more than minimal planning or he probably would have done a better job of trying to cover his tracks than what he did. The more than minimal planning, seems to me the strongest evidence, is just the period of time that it went on and the fact that Mr. Shaw did not disengage himself from this process and made affirmative representations with respect to the absence of asbestos at the site and that testing had, in fact, been done when it appears that that clearly was not the case.

-36-

> I think in the circumstance, while it's a close question, that the two point increase for more than minimal planning is appropriate, and I am going to deny that objection . . . .

(R. Vol. VIII at 1087-88.)  However, at the final sentencing hearing, the district court reconsidered this determination and denied the more than minimal planning enhancement.  It stated:

> [W]hile I think technically I was correct in dealing with [Shaw's objection to the more than minimal planning enhancement] and upholding the two-level enhancement last time, I'm not satisfied that maybe being technically correct is appropriate in this matter and taking a look at what Mr. Shaw's responsibilities actually were.  I'm planning to change my ruling on that to grant [Mr. Shaw's] objection with respect to minimal planning.

(*Id.* at 1123.)

The district court was correct the first time.  As the Government argues, and the district court found during the initial sentencing hearing, Shaw's offense involved "repeated acts over a period of time."  "[T]he notion of repeated acts refers to a series of acts each of which would be criminal standing alone, rather than referring to a crime that requires the completion of a series of steps."  *United States v. Proffit*, 304 F.3d 1001, 1005 (10th Cir. 2002).  In order to have "repeated acts," "there must have been more than two instances of the behavior in question."  *United States v. Bridges*, 50 F.3d 789, 793 (10th Cir. 1994).

The evidence at trial clearly showed that Shaw engaged in more than two acts of concealment of the presence of asbestos (each of which would be criminal standing alone) over a four year time span.  In 1993, before Branscum's first visit to the refinery, Shaw told the Stifflers not to allow any government inspectors on the property.  After Branscum's visit, Shaw telephoned Alice Law of the EPA,

-37-

falsely informing her no asbestos was present in Area A of the refinery. The next day, he filed the first Notification of Demolition and Renovation and cover letter, falsely stating he had inspected the property, no asbestos was present in Area A and ESCM would be "working with [the Stifflers] very closely on the remainder of [the demolition] project to assist them in their compliance efforts." (R. Supp. Vol. I at 39.) In March 1994, Shaw conducted a fraudulent sampling of the refinery. He also observed holes where the Stifflers had buried insulation and told the Stifflers they could continue to bury the insulation.[33] On June 20, 1994, Shaw submitted another cover letter and the revised Notification of Demolition and Renovation containing the forged signature of "C.L. Stiffler." These documents falsely indicated that the Stifflers had arranged for BFI to remove the asbestos from the refinery and that ESCM personnel would be on site to supervise the Stifflers' abatement activities. In 1997, the Stifflers received Shaw's permission to drop the cat cracker. In July 1997, based on Shaw's sampling of the cat cracker, Jean Stiffler informed the KDHE that the cat cracker did not contain asbestos. Contrary to Shaw's arguments, we find none of the above actions "purely opportune," that is, "spur of the moment conduct, intended to take

---

[33] Shaw argues that none of the Stifflers testified he told them they could bury *asbestos*; rather, he contends the evidence at most consisted of him telling Jean Stiffler they could bury *insulation*. This argument is disingenuous. The evidence at trial demonstrated Shaw told the Stifflers they could bury the insulation without any testing as to whether the insulation contained asbestos. The evidence further showed that the Stifflers relied on Shaw's advice concerning the removal of the insulation and Shaw never ensured that the insulation did not contain asbestos prior to its removal. Moreover, once Shaw learned the refinery contained asbestos, he never advised the Stifflers on how to properly remove and dispose of it.

advantage of a sudden opportunity." *See United States v. Rust*, 976 F.2d 55, 57 (1st Cir. 1992). Consequently, a more than minimal planning enhancement was warranted under the "repeated acts" provision of USSG §1B1.1 comment. (n.1(f)).

We also find that Shaw's offense involved "more planning than is typical for commission of the offense in a simple form."[34] The proper inquiry is whether Shaw's actions "demonstrated a greater amount of planning than [is] required" to engage in a scheme to conceal the presence of asbestos from the EPA in its simple form. *Proffit*, 304 F.3d at 1006. While Shaw's scheme to conceal the presence of asbestos could have been accomplished merely by submitting the false "Notifications of Demolition and Renovation" in 1993 and 1994, Shaw's conduct went beyond that. He also told the Stifflers not to permit any government inspectors on the property, took a fraudulent sampling of the refinery, told the Stifflers they could bury insulation from Area A and gave the Stifflers permission to drop the cat cracker. These actions demonstrate a level of planning in excess of the amount of planning required to engage in a scheme to conceal the presence of asbestos in its simple form.

The district court's reasons are insufficient for reversing its previous determination that the offense involved more than minimal planning. It did not explain why "being technically correct" was inappropriate in this case. Moreover,

_____

[34] We recognize that the district court did not address whether Shaw's offense involved more than minimal planning based on it requiring "more planning than is typical for commission of the offense in a simple form." Nevertheless, because the Government raised it below as a grounds for imposing the more than minimal planning enhancement and no additional fact-finding need be made, we address it as an additional reason the court clearly erred in denying a more than minimal planning enhancement in this case.

it is unclear how "taking a look at what Mr. Shaw's responsibilities actually were" constituted grounds for the district court reversing its prior decision. Therefore, we conclude the court clearly erred in denying the more than minimal planning enhancement and a remand for re-sentencing is necessary.

      C      Imposition of Five Level Enhancement for Loss Exceeding $40,000 and *Blakely*

Shaw contends the district court erred in imposing the five level enhancement under § 2F1.1(b)(1) based on the "loss" exceeding $40,000. He also argues his sentence violates the Sixth Amendment under *Blakely*. Because we conclude this case must be remanded for re-sentencing on other grounds, we need not address these issues. *Souser*, 405 F.3d at 1163 n.1; *United States v. Cano-Silva*, 402 F.3d 1031, 1039 (10th Cir. 2005). However, Shaw's re-sentencing must be conducted in light of the Supreme Court's recent decision in *Booker*.

### III. Conclusion

Shaw's conviction is **AFFIRMED**. We **REMAND** this matter to the district court with instructions to resentence him in accordance with this order and judgment and *Booker*.

                                      **Entered by the Court:**

                                      **Terrence L. O'Brien**
                                      United States Circuit Judge